**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    CASE NO.  3:07-cr-314-J-33-TEM

GERALD DONALD STINER

_____

## REPORT AND RECOMMENDATION[1]

### I.  Status

   This case is before the Court on Defendant's Motion to Suppress Evidence (Doc.

#23), filed on February 4, 2008, and the United States' Response in Opposition to

Defendant's Motion to Suppress Physical Evidence and Statements (Doc. #25), filed

February 11, 2008.  The Court held an evidentiary hearing on February 12, 2008.  With the

Court's permission, Defendant filed a supplemental memorandum of law on February 18,

2008 (Doc. #30).   Upon consideration of the testimony and evidence presented at the

hearing, and the memoranda of law, the Court recommends the motion be denied for the

reasons set forth below.

### II.  Background

   Defendant is charged in a single count Indictment with unlawful possession of a

firearm in and affecting commerce after having previously been convicted of crimes

_____

[1]As a matter of course, any party normally may file and serve specific, written objections within ten (10) days after service of a report and recommendation.  28 U.S.C. § 636(b)(1).  However, in this instance the parties have stipulated to a FIVE (5) DAY objection period to this Report and Recommendation (*see* Doc. #27, Clerk's Minutes; Tr. 54). Failure to file written objections within FIVE (5) days shall bar the party from a *de novo* determination by the district judge of an issue covered herein and from attacking findings on appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 45(a); Local Rule 6.02(a), United States District Court for the Middle District of Florida; *Thomas v. Arn*, 474 U.S. 140 (1985).

punishable by imprisonment for a term exceeding one year in violation of Title 18, U.S.C. §§ 922(g)(1) and 924(a)(2).  (*See* Doc. #1.)

Defendant seeks to suppress the evidence seized from his place of residence on August 5, 2007 and any oral and written statements made after his arrest on that date. Defendant requests the suppression of evidence on the basis that the police officers entered Defendant's residence without proper authorization, and thus, any fruits of the unlawful entry must be suppressed (Docs. #23, #30).

The United States argues that the officers had probable cause to believe a domestic battery had occurred on a household member and upon verifying with the victim that the domestic violence did occur, the officers entered the residence with the victim's consent (Doc. #25).  Therefore, the United States argues, as there was probable cause to be at the residence and probable cause to arrest the Defendant, the officers were lawfully on the premises and entered with the permission of the victim, all evidence and statements should be admissible (Doc. #25).  Furthermore, the United States argues the short barrel shotgun that was ultimately seized was in plain view and subject to seizure upon entrance into the house.

The Court will set forth the facts of the arrest and seizure conducted at 15239 Main Steet in Jacksonville, Florida during the evening of August 5, 2007.[2]

Defendant Gerald Stiner and his girlfriend, Janet Lynn Bartoletta, spent much of the

---

[2]The Court notes the address of the reported battery is recorded as 15239 Main Street on the submitted police report (Gov't Exh. 1).  The street address in the transcript of the hearing proceedings reflects testimony where the number was stated both as 15239 and 15329.  For purposes of this Report and Recommendation, the Court accepts the address recorded in the police report as the actual address of Defendant's residence.

day on August 5, 2007 drinking at a bar identified as H.J.'s Misbehavin on Main Street in Jacksonville, Florida (Tr. 34, 37). Sometime after their return to their residence, Defendant Stiner and Ms. Bartoletta got into a fight, which escalated into physical altercation (Tr. 34). According to Ms. Bartoletta, the physical altercation took place in the living room and the kitchen (Tr. 39). She stated she was beaten and was shaken up, both physically and emotionally (Tr. 41). In her words, "the whole left side of [her] face was pretty much black and blue" (Tr. 50). Ms. Bartoletta further testified that once every few months she and the Defendant had a "knock-down drag-out" fight (Tr. 43).

During the beating, Ms. Bartoletta testified her daughter had telephoned her and she answered the phone, but the Defendant had grabbed the phone and "threw it off" her (Tr. 36). As the phone remained off the hook, Ms. Bartoletta testified she believed her daughter and her mother, who was present with the daughter, heard the fighting with the screaming and the hollering (Tr. 36, 42). It was later ascertained that Ms. Bartoletta's mother had made the 911 call to alert police that her daughter was being beaten (Tr. 35, 42).

At approximately 8:00 p.m. on August 5, 2007, Officer Sandy Taylor and his backup, Officer R.B. Schlesier, of the Jacksonville Sheriff's Office (JSO) were dispatched to 15239 Main Street in Jacksonville, Florida (Tr. 7). The dispatch was in response to a 911 call concerning a possible domestic battery (Tr. 7, 28). Officer Taylor and Officer Schlesier arrived on the scene in separate vehicles. The residences in the area were not well marked. The officers traveled down a dirt road running next to the homes in the area and knocked on the front doors of two trailer homes before locating 15239 Main Street, which turned out to be a small house and the third location at which the officers knocked (Tr. 8, 21, 40). Officer Taylor stated the residents at the trailer homes did not know the address

3

by the number given, so he and Officer Schlesier worked their way to the designated address by process of elimination (Tr. 22).  Officer Taylor knocked on the front door of Defendant's residence.  What happened next is the subject of dispute.

Officer Taylor testified that Janet Bartoletta answered the door (Tr. 8).  He noted she had obvious swelling around her left eye and injuries to the left side of her face (Tr. 9).  From his experience in terms of having seen people that had been hit or struck, Officer Taylor testified that the injuries appeared to be fresh (Tr. 9).  He asked Ms. Bartoletta what had happened to her and she stated that "Gerry" had hit her.  Ms. Bartoletta mentioned she had some additional bruising on the left side of her torso (Tr. 12).  Not knowing who Gerry was, the officer asked Ms. Bartoletta, who responded that Gerry was her live-in boyfriend of the past three years (Tr. 9-10).  Officer Taylor stated that at this point in time he and Officer Schlesier were still on the small porch in front of the house and Ms. Bartoletta was in the doorway (Tr. 11).  Ms. Bartoletta was talking in a "hushed, quiet voice" and appeared to be fearful of someone else in the residence hearing her.[3]

Officer Taylor then asked where was Gerry.  Ms. Bartoletta stood aside and pointed to the bedroom doorway (Tr. 12-13, 26).  Officer Taylor interpreted Ms. Bartoletta's actions as giving consent to enter the residence.  Whereupon, he and Officer Schlesier entered the home and walked toward the bedroom (Tr. 13).

In contrary testimony, Ms. Bartoletta stated that she did not answer the knock on the door, but that upon hearing the knock she got up off the couch to start toward the bedroom

---

[3]Defendant's counsel objected to the officer's conclusion that Ms. Bartoletta was speaking quietly so as not to be heard by anyone else in the home.  The Court allowed the testimony based on the officer's personal observation of Ms. Bartoletta's demeanor.

when one officer "came through" the door and asked what had happened to her and another officer came around the first officer asking where was her boyfriend (Tr. 36, 37, 44-45).  According to Ms. Bartoletta, one officer stayed with her while the other officer went into the bedroom (Tr. 44-45).  Ms. Bartoletta estimated the entire encounter took "two seconds, if that long" before the one officer headed into the bedroom (Tr. 37).  Ms. Bartoletta did recall one of the officers told her that they had to go to a neighbor's house to find out which house was the one to which they had been dispatched (Tr. 40, 45).  She also affirmed neither officer made any threats to her (Tr. 48-49).

The Defendant was found lying on the bed asleep in the bedroom to where Ms. Bartoletta had pointed (Tr. 13-14, 24).  Next to the Defendant, in plain view, was a shotgun that was obviously short-barreled (Tr. 13-14).  The shotgun was laying on a bedside table, within Defendant's reach (Tr. 30).  Officer Taylor testified that Officer Schlesier removed the firearm for their safety, before awaking Defendant.

After Defendant Stiner was awakened and stood up, Officer Taylor handcuffed the Defendant, advised he was being detained for domestic violence investigation and advised Defendant of his rights (Tr. 14-15, 24, 31).  Defendant was then taken out of the house and placed in a patrol car, where the *Miranda* rights were read to him from a card, this time (Tr. 14-15).

While in the patrol car, Defendant was asked about the firearm.  His response was that he did not own the shotgun, but kept it in the house for his own personal protection (Tr. 15).  Defendant was also asked if he had ever been in prison before, to which he responded affirmatively that he had been in prison in Pennsylvania (Tr. 16).  This information was confirmed by the officers who had someone at JSO headquarters run a

5

criminal history check, from which they learned Defendant Stiner had prior felony convictions (Tr. 17).

Ms. Bartoletta corroborated Defendant's statement that he did not own the shotgun. She testified that she had found the shotgun when they first moved to the house in March of 2007 (Tr. 46). Ms. Bartoletta also corroborated Officer Taylor's testimony concerning the location of the gun on the evening in question. She testified that after she was sure Defendant was asleep, she took the shotgun from the closet and put it on the end table beside the bed (Tr. 47, 49). Ms. Bartoletta testified she took this action because she "wanted it to end" and she believed if the Defendant woke up "still in his mood" he would either kill her or kill himself with the gun (Tr. 46-47).

Defendant was arrested that night for domestic battery, possession of a firearm by a convicted felon and possession of a short-barreled shotgun (Tr. 17). Ms. Bartoletta was transported to Hubbard House that evening, and later departed for Pittsburgh, Pennsylvania where she stayed with her mother until December 19, 2007 (Tr. 35, 43-44). At the time of the suppression hearing, Ms. Bartoletta again resided with Gerald Stiner at the address of record stated herein (Tr. 33).

### III. Credibility of Witnesses

As do many cases of this nature, the determination on whether to suppress evidence hinges in large part on the credibility of the witnesses. Credibility determinations are left to the trial court, because it is the finder of fact who personally observes the testimony and is in the better position to assess witness credibility. *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (internal citation omitted). A reviewing court will defer to a magistrate judge's determination in evaluating the factual version of events on a motion to

suppress evidence, unless the magistrate's understanding of the facts appears to be "unbelievable." *Id., quoting United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985).

The testimony of the Defendant's witness clearly differed from the police officer who testified on key points concerning the officers' entry into the residence.  The primary area of difference is in how the door was answered and how the police gained entry to the residence.  Ms. Bartoletta stated that she never got to the door to answer it (Tr. 41), but the officers just came walking in after knocking and one officer headed for the bedroom within two seconds (Tr. 37, 41).  Officer Taylor testified Ms. Bartoletta answered his knock on the front door, conversed with the two officers for three to five minutes about her physical condition and how she came to be beaten, then stood aside and pointed to the doorway of the bedroom where Defendant Gerald Stiner, who she identified had beaten her, could be located (Tr. 9-13, 24-27).

The Court finds the testimony of Janet Lynn Bartoletta not totally credible for two primary reasons.[4]  First, Ms. Bartoletta has an obvious interest in Defendant remaining free from incarceration.  Ms. Bartoletta acknowledged she had known the Defendant for almost four years and they had been in a relationship most of that time (Tr. 44).  She testified she had moved back into the residence with Defendant on December 19, 2007 and she had forgiven him (Tr. 43-44).  She also testified she did not want to see anything happen to the Defendant in this case (Tr. 48).

---

[4]The Court will acknowledge that part of Ms. Bartoletta's testimony was remarkably candid.  She acknowledged her mother was a battered wife and that the Defendant strikes her during fights every few months.  She also stated she placed the shotgun by the bed in which the Defendant was sleeping with the thought he would either kill her or shoot himself; although that statement possibly could be interpreted as an attempt to give the Defendant a possible defense at trial.

Second, there are aspects of Ms. Bartoletta's testimony that are simply illogical.  For example, she testified the two officers "just came through the door" without awaiting for anyone to answer it and almost simultaneously asked her what happened and where was her boyfriend.  If the police had never been called to the residence before, as Ms. Bartoletta testified (Tr. 48), how would one officer know to ask about a "boyfriend?"  Furthermore, the house was admittedly quiet when the officers arrived on the scene (Tr.  22-23 ), which belies any reason to barge in the front door.  Officer Taylor testified he and his partner had knocked on the doors of two trailer homes, in an effort to find the correct residence, prior to approaching Defendant's residence.  Nothing in the record suggests the officers forced entry into each of the three homes.  The Court finds it difficult to believe that officers willing to engage in tactics such as barging through the front door of a residence uninvited,  would choose to barge in the third home after calmly knocking on the front doors of two other homes.

The Court does, however, find the testimony of Officer Sandy Taylor to be credible because his recitation of the events follows a logical pattern and he has no vested interest in the outcome of this case.  Officer Taylor had no prior knowledge of Defendant, or prior contact with him, nor did the Defendant give the officers any difficulty during the arrest.  Additionally, no major contradictions between police report and the testimony were brought out to impeach Officer Taylor.

The Court thus finds the testimony of Officer Sandy Taylor presented at the suppression hearing to be more credible than that of Defendant's witness, Ms. Janet Lynn Bartoletta.

## IV. Conclusions of Law

Motions to suppress evidence relevant to a criminal trial present mixed questions of law and fact for the court's determination. *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (internal citations omitted).   A circuit court of appeals reviews the district court's findings of fact under the clearly erroneous standard, but application of the law to those facts is subject to *de novo* review.   *Id.*

A warrantless entry into a person's home is presumed to be an unreasonable violation of one's Fourth Amendment rights. *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002) (citing *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (citing *Payton v. New York*, U.S. 573, 586 (1980)).   The warrrantless search of a residence is likewise presumed to be unreasonable.   *Id.*   However, consent to enter and consent to search a home are well recognized exceptions to the requirement that police obtain a warrant. *Id.*   A warrantless entry is valid when it is based upon the consent of a third party whom police reasonably believe possesses common authority over the premises.   *Illinois v. Rodriguez*, 497 U.S. 177 (1990).   Yet, when consent to the entry into a residence was prompted by a show of official authority, the consent may not have been legally obtained and any evidence seized thereafter may be tainted by the illegal entry.   *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) (finding the defendant's action of stepping back from the front door with his hands behind his head to be an acquiescence to a show of official authority in light of the number of FBI agents present and the announcement of their presence by an agent yelling "FBI. Open the door." ).

9

## A.  Voluntary Consent

In the instant case, Defendant Stiner does not contest Ms. Bartoletta's authority to consent to entry and search of the home, rather he contests the consent itself.

The United States relies, in part, upon *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002) in claiming the entry Ms. Bartoletta allowed was with her consent and was not prompted by a show of official authority (Doc. #25 at 5).  In that case, the Eleventh Circuit did not find "official authority" when several officers without guns drawn knocked late at night and requested to search the apartment.  *Id.* at 751.  The *Ramirez-Chilel* court cited *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) as an example of "official authority" entry.  As noted *supra*, in *Edmondson*, numerous federal agents with weapons drawn surrounded a suspected bank robber's apartment and knocked on the door, yelling "FBI. Open the door."  *Edmondson*, 791 F.2d at 1514.  The court in *Ramirez-Chilel* did not find a "show of force" as set forth in *Edmondson*, but found that the defendant had yielded the right-of-way in allowing the officers inside.  289 F.3d at 751-52.  That body language was sufficient for a determination implied consent.

From the testimony in this case, and the argument presented, the Court concludes Ms. Bartoletta implicitly consented to entry of the officers into the home she shares with the Defendant.  In *Rameriz-Chilel*, the court determined the actions of the defendant in "yielding the right- of-way" implied his consent to enter the residence.  289 F.3d at 750-52.  In *Holmes v. Kucynda*, 321 F.3d 1069, 1078-79 (11th Cir. 2003), the court found consent to enter was given by the cotenant's action of stepping aside and acquiescing in entry.  Similarly, this Court finds Ms. Bartoletta's actions of stepping aside at the front door and pointing to the location of the bedroom where the Defendant could be found were clearly

10

indicative of her "yielding the right-of-way" in consent for the officers to enter the premises and arrest the Defendant.  The Court also finds the implicit consent was particularly logical in the context of the fact that Defendant had just beaten her a short time earlier.

When determining that consent has been given, irrespective of whether the consent goes to a search for evidence or entry into a residence, the Court must also determine that the consent was voluntary.  In order for Ms. Bartoletta's consent to stand, it must have been voluntary and not merely acquiescence to a claim of lawful authority.  *Florida v. Royer*, 460 U.S. 491, 497 (1983).  The Court has guidance from *Rameriz-Chilel* and *Edmondson*, noted *supra,* when examining what constitutes a show of authority.  Whether an individual's consent was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 223-29 (1973).

Among the relevant facts considered when a court assesses whether consent was freely and voluntarily given, are the custodial status of the person giving consent, the presence of coercive police procedure, the extent and level of cooperation with the police, the person's awareness of her right to refuse to consent to entry or search of the premises, the education, intelligence and the subjective state of the person who consents.  *See Tukes v. Dugger*, 911 F.2d 508, 517 (11th  Cir. 1990) (internal citations omitted).  While the consent need not be "knowing" in the sense that a person must be told of her right to refuse to consent, the lack of advice of the right to refuse consent is a factor to be considered by the Court.  *Schneckloth v. Bustamonte*, 412 U.S. at 227-234.

Here, it is important to recall the police officers were dispatched in response to a 911 call concerning a possible domestic battery.  There is no evidence Ms. Bartoletta was  in

11

police custody at any point.  Rather, what was apparent was that Ms. Bartoletta had been recently beaten by someone, who upon questioning she identified as "Gerry" her "boyfriend," who was still in the house.[5]  Ms. Bartoletta testified she was "shaken up" both physically and emotionally when the officers arrived, but she was not as upset as she had been earlier (Tr. 41, 47).  Although Ms. Bartoletta confirmed she had been drinking with the Defendant that day, she also stated that as the fight wore on she had become more sober and was, in fact, at the point of falling asleep when the police arrived (Tr. 41, 47, 51). Officer Taylor testified Ms. Bartoletta opened the door after he knocked, stood in the doorway during their conversation and did not display any indication, such as slurred speech or instability on her feet, that she might have been intoxicated (Tr. 25-26).  There is no evidence in the record of any coercive tactics by the two officers on site.  In fact, Ms. Bartoletta testified she was not threatened by the police and they were the ones who took her to the Hubbard House to get help (Tr. 48-49).

Considering the totality of the circumstances, the Court finds Ms. Bartoletta's consent to enter the residence was freely and voluntarily given.

**B. Plain View Doctrine**

In *Horton v. California*, 496 U.S. 128 (1990), the Supreme Court held that warrantless seizure of evidence in plain view is permissible under the Fourth Amendment if the initial intrusion that brings police "within plain view of such an article is supported... by one of the recognized exceptions to the warrant requirement" and the "incriminating

---

[5]*See, e.g., United States v. Holloway*, 290 F.3d 1331 (11th Cir. 2002), wherein the Eleventh Circuit held that police officers did not violate the Fourth Amendment when they conducted a warrantless search of the defendant's home in response to an emergency situation reported by an anonymous 911 caller.

character" of the item is "immediately apparent." *Id.* at 135-37. In this case, the Court has determined Officers Taylor and Schlesier were given consent to enter Defendant's residence by cotenant Janet Bartoletta. The short barrel shotgun seized from Defendant's residence was found laying on a bedside table, within Defendant's reach, when the officers first entered the bedroom and spotted the shotgun in plain view. Officer Taylor testified it was apparent on sight that the firearm was a short barrel shotgun, the possession of which would violate state law. *See* Fla. Stat. § 790.221 (2007). Ms. Bartoletta testified she knew the shotgun was on the bedside table, as she had placed it there herself. Thus, the prerequisites for a warrantless seizure of evidence were clearly met in this instance.

The law enforcement officers were lawfully present where the evidence was discovered. The evidence was observed by the officers in plain view; no search was conducted to uncover the shotgun. The inculpatory nature of the shotgun was readily apparent from the length of the barrel. *See United States v. Santiago*, 410 F.3d 193, 200-01 (5th Cir. 2005).

After securing Defendant, the officers measured the shotgun and verified the barrel to be less than sixteen (16) inches, as permitted by law. Fla. Stat. §§ 790.221, 790.001; *State v. Astore*, 258 So.2d 33 (Fla. 2d DCA 1972) (finding statute declaring it unlawful for any person to own or have a short-barreled rifle and defining a "short-barreled rifle" as a rifle having one or more barrels less than 16 inches in length and any weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches was not unconstitutionally vague and did not violate right to bear arms). Confirmation of Defendant's criminal background only added to the immediately apparent incriminating nature of the seized evidence. Thus, seizure of the firearm was lawful and the evidence

is admissible at trial.

## C.  Defendant's Oral and Written Statements

Defendant Stiner contests the admission of his oral and written statements made on August 5, 2007, as fruits of the poisonous tree.  The Court has found Mr. Bartoletta's consent to enter the home was voluntarily, knowingly and freely given.  Further, the Court finds Defendant was recited his *Miranda* rights on two separate occasions----once in the bedroom and once in the patrol vehicle to which he was taken.

On the facts presented, the Court does not find any evidence threats or coercion were used to convince Mr. Stiner to sign either a consent to search or the *Miranda* waiver form.  In fact, the Court is unsure what specific oral and/or written statements the Defendant seeks to suppress because this information has not been supplied to the Court. The Motion to Suppress is not specific as to any statements made by Defendant, the memoranda of law do not refer to incriminating statements Defendant seeks to suppress, the witness testimony did not touch on statements the Defendant desires to suppress, the oral argument of the parties omitted reference to any specific statements the Defendant may want suppressed.  The Court could theorize Defendant wishes to suppress his statement concerning his prior prison record, but declines to do so.  That statement was made after Defendant had twice been informed of his *Miranda* rights.  Furthermore, normal police procedure would call for running a criminal background check on Defendant, wherein the information concerning his felony convictions would have inevitably come to light regardless.

Because Defendant was properly informed of his *Miranda* rights, the Court finds his statements to the police officers subsequent to his arrest on August 5, 2007 were freely

14

made and are thus admissible.   Therefore, Defendant's statements should not be suppressed.

### V.  Recommendation

Based on the foregoing findings, the Court recommends Defendant's Motion to Suppress Evidence (Doc. #23) be **DENIED.**  All physical evidence obtained, and  oral and written statements made subsequent to Defendant's arrest at his residence on August 5, 2007 should be admissible evidence.

**DONE AND ENTERED** at Jacksonville, Florida, this 27th   day of February, 2008.


Copies to:

Hon. Virginia M. Hernandez Covington
United States District Judge

United States Attorney (Talbot)
Federal Public Defender (Burke)

THOMAS E. MORRIS
United States Magistrate Judge